The complainants seek to foreclose a mortgage made and executed by Frank J. Bernett and Minnie K. Bernett, and Michael Koerber on the premises now owned by the defendant Minnie Camilleri. The mortgage is for $2,500; it was executed on December 15th, 1915, and became due July 1st, 1917. It is recorded in book 862 of mortgages for Hudson county on page 315.
The defendant Minnie Camilleri purchased the premises from Joseph A. Zimmerman and Mary, his wife, by deed dated July 28th, 1924, recorded September 4th, 1924, in the office of the register of Hudson county in book 1542, page 323.
Joseph A. Zimmerman purchased the property March 20th, 1922, for $500 from the sheriff of Hudson county at a sale held on the foreclosure of a mortgage. The bill in the foreclosure proceedings was filed July 30th, 1920. The mortgage foreclosed was one held by the complainants, Emil Hofstetter and Minnie Hofstetter. The complainants contend that the mortgage was foreclosed without their direction, and without their knowledge. The mortgage was obtained and placed upon the premises in question through a realtor, the said Joseph A. Zimmerman, acting for the Hofstetters. They never examined the premises given as security for the loan before they advanced their money, nor did they ever meet the original mortgagors. Zimmerman made the contacts with the mortgagors and recommended the loan. He collected the interest which became due on the mortgage from the time the same first became due and he regularly paid it *Page 145 
to the Hofstetters until sometime in the year 1933. The Hofstetters receiving no interest in the year 1933 when it became due, and about the same time noting a news item in the press that Zimmerman had been convicted of embezzlement, or some criminal offense, they made inquiry and learned from Mrs. Camilleri the defendant, who occupied the mortgaged premises, that she had bought the property from Zimmerman. They then made further inquiry which disclosed that Zimmerman purchased it at a sheriff's sale initiated through the foreclosure of their mortgage. The Hofstetters denied that Zimmerman was authorized to collect any part of the principal; although, on other occasions, Zimmerman collected the principal of mortgages which the Hofstetters held and he was permitted to retain the money so collected for investment in other mortgages. The mortgage in the instant case as stated, was for $2,500; this sum, in the form of a check to Zimmerman's order, was delivered to him on or before December 15th, 1915, by the Hofstetters. The papers incident to the mortgage transaction, Zimmerman retained in his safe until about eight or ten years ago, when Mrs. Hofstetter demanded them from Zimmerman. He gave them to her. Sometime afterwards she noticed above the endorsement of the title on the back of the mortgage in type the word "copy."
The Hofstetters testified that while they read the newspapers, they had never read or had noticed the legal advertisements of the said foreclosure proceedings, or the intended sale of the premises thereunder. Emil Hofstetter stated his wife attended to all their business affairs; that he never had inspected the mortgaged premises; nor had he met the mortgagors; that he relied on Zimmerman to attend to the matters incident to the execution and recording of the mortgage. He further said that the papers concerning the particular mortgage transaction were held by Zimmerman for a great many years, and that his wife, Mina Hofstetter, obtained the mortgage papers from Zimmerman about eight or ten years ago and placed them in a safe deposit box. He said that he noticed the word "copy" typed above the title on the back of the mortgage in question. *Page 146 
William F. Burke, the attorney who foreclosed the mortgage, stated that he had the original mortgage under which the foreclosure was instituted since July, 1920. It had never been out of his possession. He said that the bond and mortgage was produced before the master in the foreclosure proceedings — William C. Asper, now deceased.
The defendant Minnie Camilleri has been in possession of the premises since July 28th, 1924. She and her husband, now deceased, had contracted to purchase the premises from Zimmerman. They had the title searched by Percy Britt, an attorney. Britt, also, represented the Wetherbee Park Building and Loan Association, which was, subsequently, succeeded by the defendant, the New Liberty Building and Loan Association, which advanced the mortgage loan on the premises. Britt certified to the validity of the title. The Camilleris have paid the taxes, assessments due against the property, and the monthly installments due on the building and loan mortgage from the time they acquired the title in July, 1924. Mrs. Camilleri had never met the complainants until about August or September, 1933, when Emil Hofstetter called at her home and inquired about the mortgage.
The complainants never held an insurance policy on the premises since 1929; and they never had inspected, nor had seen any receipted tax bills for the premises. They relied on Zimmerman to attend to these details. Mina Hofstetter said it was five years since she saw a policy of insurance on the property. She advanced moneys on mortgage loans on the recommendation of Zimmerman. She testified that she had not met the owners of those properties which secured her loan. She said Zimmerman did not want her to meet them because they would "give me hard luck stories." She said that two of her mortgagors had called to see her about paying her the principals of her mortgages and she then went with them to Zimmerman's office where the sums due under them were paid. She admitted that the principal of another mortgage was paid to Zimmerman and that he said to her, "we will take it and I will place it somewhere else;" and that she then said, "we will lose three months' interest by accepting the principal at this time;" whereupon Zimmerman said, *Page 147 
"we will make it up somewhere else." She declared she left the papers relating to her different transactions with Zimmerman because she had no safe. She also testified that Zimmerman told her that the Camilleris had bought the house; and that he gave her the insurance policies covering the premises.
The complainants take the position that Zimmerman was not their agent to accept the principal of the mortgage, or to foreclose the same, or to do anything in connection with the property except to collect the interest on the mortgage. In view of their attitude, I considered it necessary to detail the evidence to the extent I have. I do not believe the evidence justifies the complainants assuming their announced position. Considering the relations between the complainants and Zimmerman, covering a period of years, and the number of transactions, I am not satisfied that their contentions as to Zimmerman's agency powers are entirely correct. He held their trust and confidence in their mortgage loans; in the collection of their interest, and, in several cases, principal. He placed the insurance on the properties; he held the policies and paid the premiums; he inspected the properties for the purpose of determining whether the loan should be placed; and he effected the relationship between the complainants and the mortgagors. I think the principles enunciated in the case of Stone v. Limouze,111 N.J. Eq. 423, apply to the instant case. The court of errors there said:
"Complainants placed moneys in the hands of Perle for a definite purpose. Perle did not use them for that purpose, but turned them over to Limouze for a different purpose, but without notice to Limouze and without his knowledge that the moneys were other than the property of Perle or that complainants had any interest therein. It follows upon well established principles, that Limouze was not chargeable with any trust; that since the complainants had it in the power of their agent to use the moneys, and since, where one of two innocent parties must suffer, the loss must fall upon complainants who reposed the confidence and thereby made the loss possible."
Vice-Chancellor Church in the case of Schultz v. Partrick, *Page 148 110 N.J. Eq. 295, followed the principle laid down in Lawson
v. Carson, 50 N.J. Eq. 370 (at p. 378), wherein Vice-Chancellor Green said:
"It is a hard case, as before stated, but the recognized rule is where one or the other of two innocent parties, must suffer by the fraud of a third, the loss should be sustained by the one whose conduct has made the fraud possible." Citing ParkviewBuilding and Loan Association of Newark v. Rose,90 N.J. Law 614.
The complainants placed the utmost faith in Zimmerman and they relied upon him absolutely in their mortgage investments. They did not inquire into, or examine, such investments to ascertain, or determine, the nature and worth of the property upon which they had placed, or contemplated placing their money; they were willing to take a chance on the judgment and character of Zimmerman; they failed to observe whether the policies of insurance sufficiently covered the properties in which they invested; and they failed to inspect the tax receipts affecting the property upon which they had accepted mortgages. They did not extend any effort to ascertain whether the persons to whom they advanced moneys were financially or otherwise responsible. They gave Zimmerman full authority to attend to all of these matters. They allowed him to retain all of the papers relating to their investments for a period of approximately eighteen or nineteen years.
The defendant New Liberty Building and Loan Association, succeeding as aforesaid the Wetherbee Building and Loan Association, certainly endeavored to ascertain the true situation surrounding the acquisition of the title to the premises by the Camilleris. It had the title investigated and it obtained an abstract of the chancery proceedings covering the foreclosure of the mortgage under which Zimmerman obtained the title. The bill of complaint in the foreclosure was filed July 30th, 1930, in the name of the then record owners; annexed to it was an affidavit purporting to be signed by Emil Hofstetter. On its face, there was nothing to indicate anything irregular, or that it was not the signature of Hofstetter. It would not be reasonable to expect the title *Page 149 
examiner, or the building and loan association, to go to the extent of hunting up Hofstetter and ascertaining from him if he signed the instrument which was submitted in evidence to the master who heard the foreclosure proceedings, since there was nothing suspicious about it. The proceedings in foreclosure appear to have been regularly advertised and published in the press. The evidence of the title search, and the inspection of the court record upon which the attorney of the present owner relied in the examination of the title, appears to be regular. Due diligence was observed by the building and loan association and the present owner. No more could be expected, or required of them.
The sheriff's deed was placed on record two or more years before the present owner, Mrs. Camilleri, and her deceased husband, acquired the title.
The rule laid down in the case of Heyder v. ExcelsiorBuilding Loan Association, 42 N.J. Eq. 403 (at p. 408), has a bearing on the facts in the instant case. Among other things the court there said:
"Where one gives to another the power to practice a fraud upon innocent parties, the court will not interfere in his protection at the expense of those who have been deceived and misled by such fraud. What circumstances shall be sufficient to establish negligence, such as shall preclude a mortgagee from a decree establishing his canceled paper, must be determined as a question of fact in each particular case, tested by those rules of conduct which men of common prudence usually observe in the care and management of such securities."
The case of the defendants finds support in the opinion of Vice-Chancellor Backes in the case of Moore v. Riddle, 82 N.J. Eq. 197,
who, among other things, said:
"There is no principle of equity better settled nor more uniformly enforced than `whenever one of two innocent persons must suffer a loss by the acts of a third, he who has enabled such third person to occasion the loss must sustain it.' Or, as it is sometimes expressed, `that as between two persons equally innocent, a loss resulting from the fraudulent *Page 150 
acts of another shall rest upon him by whose acts or omissions the fraud was made possible.' Mr. Chief-Justice Holt puts it: `For, seeing that somebody must be the loser by this deceit, it is more reason that he who employed and put trust and confidence in the deceiver should be the loser than a stranger.'"
The principle expressed in Putnam v. Clark, 29 N.J. Eq. 412
(at p. 415), is much in point.
In 2 Corp. Jur. 461 ¶ 71, under the title "Agency," the following rule is expressed:
"Accordingly, it is a general rule that when a principal by any such acts or conduct has knowingly caused or permitted another to appear to be his agent either generally or for a particular purpose, he will be estopped to deny such agency to the injury of third persons who have in good faith and in the exercise of reasonable prudence dealt with the agent on the faith of such appearances, although no consideration moved to the alleged principal, and although there was no actual fraud on the part of such principal, as the estoppel may be allowed on the ground of negligent fault on his part, on the principle that where one of two innocent persons must suffer loss, the loss will fall on him whose conduct brought about the situation. This rule is particularly applicable where the principal has knowingly by such acts and conduct recognized the agency through a long course of dealing or in many transactions." Putnam v. Clark, supra;affirmed, 33 N.J. Eq. 338; Morris v. Joyce, 63 N.J. Eq. 549;Atlantic Guaranty, c., v. McDevitt, 105 N.J. Eq. 570; Miller
v. Schielke, Ibid. 337; Rocco v. Geiger, 113 N.J. Eq. 583;Severance v. Deutsch, 117 N.J. Eq. 144.
On the question of agency the principle laid down in 2 Corp.Jur. 448 ¶ 46, approaches the situation under consideration. It is as follows:
"If a money lender employs the intermediary to negotiate loans, to examine the title to property offered as security, to see that the property is discharged from prior encumbrances, to prepare the papers and see to the execution thereof, to pay over the money to the borrower, or to perform other services in regard to the loan, these facts, taken collectively or in various lesser combinations, justify an inference that the intermediary is the agent of the lender." *Page 151 
The court of errors and appeals, in the case of Partrick v.Groves, 115 N.J. Eq. 208 (at p. 211), in discussing the statute of limitations and laches in circumstances similar to this case, said:
"In equity, the period of limitation begins to run only from the discovery of the fraud by the injured party, or until he was in a situation where by the exercise of reasonable diligence he would have discovered the fraud."
A more definite treatise on the matter is set forth in 21Corp. Jur. 247 ¶ 244, wherein it is stated:
"Where ignorance of the facts is alleged as an excuse for delay, the general rules on the subject of notice, actual and constructive, come into application. Ignorance due to negligence does not excuse laches. One must have been diligent and have made such inquiry and investigation as the circumstances reasonably suggested and permitted. Means of knowledge are equivalent to actual knowledge and knowledge of facts sufficient to suggest inquiries which, if made, would lead to knowledge of the facts in question, is sufficient to charge one with notice of the latter facts. This rule applies to suits based on fraud, and plaintiff's ignorance will not be excused if he did not use ordinary diligence to inform himself of the facts or to avail himself of his means of knowledge."
The foregoing doctrine was approved in the case of Crawford
v. Lees, 84 N.J. Eq. 325, wherein under paragraph 11 the court stated:
"Laches may be predicated on delay in ascertainment of one's rights when the duty and opportunity of ascertainment exists."
In the case of Cameron v. Pennsylvania Mutual Life InsuranceCo., 116 N.J. Eq. 311 (at p. 314), the court held, speaking of delay of more than one year, in connection with those proceedings:
"Laches is not excused by simply saying `I did not know.' The test is not what the plaintiff knows but what he might have known by the use of the means of information within his reach with the vigilance which the law requires of him.'"
I believe the complainants showed a want of diligence and allowed a fraud to be perpetrated by their lack of vigilance; they trusted "not wisely, but too well."
I shall advise a decree dismissing the bill. *Page 152